EMIL SCHNEIDER v. PEVELY DAIRY COMPANY, Appellant.—40 S. W. (2d) 647.

Division Two, July 3, 1931.

302

*Allen, Moser & Marsalek* for appellant.

*Mark D. Eagleton* and *Mason, Goodman & Flynn* for respondent.

WHITE, P. J.—The plaintiff in the Circuit Court of the City of St. Louis recovered judgment from which the appeal is taken, for $12,000 for injuries received while employed in operating one of defendant's milk wagons. A defect, it is claimed, in the step of the milk wagon caused the plaintiff to fall, June 23, 1924.

He testified that he was backing out of the wagon carrying a crate container filled with milk bottles, and while stepping down and holding to a hand rail with one hand the step swayed in underneath the wagon, his foot slipped, he lost his balance and fell backward on the sidewalk, causing severe injury to his right elbow.

I. Appellant assigns error to the giving of Instruction No. 1 for plaintiff, as follows:

"Instruction No. 1.

"The court instructs the jury that if you find and believe from the evidence that on the 23rd day of January, 1924, the plaintiff was in the employ of the defendant, and that while working within the line and scope of his employment he was required to drive the wagon mentioned in evidence, and that on said date, while stepping from said wagon and using one of the steps thereon, he was caused to fall when said step did move, if you do so find, and that plaintiff was injured thereby; and if you further find that on and prior to said occasion the said step was not properly supported or secured and that by reason thereof said step would move or sway when stepped upon by the plaintiff, and that said step was thus and thereby unsafe and dangerous and not reasonably safe, and if you further find that the defendant in thus furnishing and providing the aforesaid step under the aforesaid circumstances, if you do so find, did fail to exercise ordinary care and was guilty of negligence, and that the plaintiff while using said step under the circumstances aforesaid, if you do so find, was injured as a direct and proximate result of the aforesaid negligence (if you find that the defendant was guilty of negligence in furnishing and providing a step that was not reasonably safe on account of the fact that said step would and did move and sway with the plaintiff thereon), then your verdict will be in favor of the plaintiff and against the defendant herein."

It is said to be erroneous because there was no evidence that the step as furnished was defective and the jury was not required to find that the defendant knew or by the exercise of ordinary care could have discovered a defective condition in the step in time to have remedied it prior to the plaintiff's fall.

The only evidence of any defect in the step was the evidence of the plaintiff himself. The step and its support, however, were de-

scribed by several witnesses. That description is not very clear, but it sufficiently shows that the step was fastened to rods which were bolted upon the wagon. The plaintiff described it thus:

"The step was about six inches wide, eight inches long and about seven-eighths thick. It was made of wood and bolted to the wagon. It was bolted onto some kind of an iron rod that came down. Those rods were bolted on the wagon proper, bolted in underneath the wagon. The rod had two forks on it. . . . This wagon had two steps, one on each side. They were of similar construction. The step itself, that part the foot would rest on, was made of wood. It was about seven-eighths of an inch thick, and about eight inches long, and about six inches wide.

"Q. And that was supported by two iron straps? A. One iron strap underneath.

"Q. Just one? Weren't there two? A. The one that went up.

"Q. One that went up and branched out at the bottom? A. Yes, sir.

"Q. Into two parts? A. Two parts underneath the wagon; one part underneath the step.

"Q. And what was at the bottom of the step? Was there a cross-piece there? A. There was mudguards fastened on each end of that.

"Q. Do you know how the step itself was fixed to the strap? Was that by a bolt? A. Yes, sir.

"Q. And then the strap was fixed to the bed of the wagon also by bolts? A. Yes, sir."

Mr. Provence, foreman of the defendant company, described it thus:

"Q. Just describe how the steps are fastened? A. Well, the steps are fastened through the lower body, that is, the railing of the body. There are two bolts; and they come down in a kind of an 'L' on a rod of iron, I would say seven-eighths of an inch, or something like that, and make a bend over like this (indicating) for the step, and there is a brace coming up from the back that goes up underneath the wagon, kind of forks out like that (indicating) for the braces, and then on either side of the step, front and rear, they were fastened onto the mudguards, the front and rear mudguards."

That witness then described it more particularly, as follows:

"Q. Can you draw it? A. Well, I am not much at drawing, but I would bring this down here as my step (indicating), and here (indicating) would be my mudguard fastened over this way (indicating), but this here (indicating) is bolted on here with about two bolts through this timber or bottom part of the body of the wagon (indicating), and then this brace would come up in the rear something like this, you see (indicating).

"Q. That brace would run in a sort of diagonal direction back towards the center of the wagon? A. This would be on an angle of forty-five, or something like that. It would come in underneath the body of the wagon."

Respondent asserts that appellant has not brought all the evidence here. Mr. Provence's explanation of the way the step was secured to the wagon largely consists of gestures which do not appear in the record. Respondent retorts that if the evidence on that point cannot be considered on account of the gestures this court would not have a record upon which to determine the sufficiency of the evidence in any case unless a moving picture were used and its revelations appended to the record.

It is apparent from plaintiff's description, and that of Provence, that a brace or braces were bolted to the wagon on the outside perpendicularly and also forked and went underneath the wagon; that a projection from those braces extended horizontally, that the step rested upon those braces and that the ends were bolted to the mud-guards. There was no evidence and nothing in the plaintiff's statement from which it may be inferred that the step was dangerous *when furnished.* While the description depends somewhat upon gestures of defendant's witness, plaintiff's counsel has not at any point indicated anything in the evidence to show that the step itself was defective, or that it was not properly braced and bolted to the wagon.

Plaintiff related how the injury occurred:

"I had been using that same wagon for some considerable period prior to the day I was injured. I had trouble with it before, in the manner I have described, about three months before. At that time the front mudguard came loose. The nuts came off of the bolts.

"THE COURT: You are referring to this step?

"MR. EAGLETON: Yes.

"THE COURT: Are you talking about this right step? A. Yes sir.

*"Questions by Mr. Eagleton.*

"A. I called that matter to the attention of the foreman of the dairy, Mr. Provence. He directed me to see the head stablejack, whose first name is Gus. There were written rules in my book that required me to go to the stablejack with those matters. When I went to Gus that time about three months before, the right hand step was fixed the next day. There were new bolts put in there, with new nuts on them."

An additional abstract of the record filed by respondent continues plaintiff's evidence, as follows:

"Q. And when did you next experience any trouble with it? A. About four or five days before the accident.

"Q. And what was the trouble that you experienced then? A. Well, as I was delivering milk I was getting off the wagon, and the step swayed underneath, and I lost my balance on it and fell onto the sidewalk. As I fell on the sidewalk I looked underneath the wagon to see what the trouble was, and I found two bolts missing underneath.

"Q. Bolts or nuts? A. Or nuts.

"Q. Which was it? A. Nuts.

"Q. What did you do? Well, I kept on delivering milk after that.

"Q. What did you do with the wagon after that time? Did you report it to Gus? A. Yes, sir; I turned it in.

"Q. And what did he do about it this next time, about four or five days before the accident? A. He put on new nuts.

"Q. Did he put in new bolts? A. No, sir.

"Q. Just new nuts? A. Yes, sir.

"Q. And did you use it again after that time? A. I did.

"Q. From that time up until the time you got hurt, how did it act? A. Well, the next morning I got hold of the wagon and I looked at the wagon, and I seen the new nuts on the bolts, and I tried out the step. As I did, it kind of gave a little movement, and I went back and told the stablejack about it. He said, 'Well, go on ahead;' he says, 'It will adjust itself in course of time.'

"Q. And did you go ahead and use it after that time? A. Yes, sir.

"Q. Up until you got hurt? A. Yes, sir."

The plaintiff on cross-examination said:

"Q. You don't remember; and then in addition to being fastened that way, it was fastened at the front and the back by being attached to the mudguards, is that right? A. The mudguards, on each end and the strap in the center. . . .

"Q. What was the trouble with the step the first time? A. The front mudguard, the nuts came off of the bolts; they loosened up, causing the mudguard to hit the front wheel.

"Q. What is that mudguard made out of? A. Sheet iron.

"Q. Did it drop down against the wheel? A. Yes, sir; if you would stand on the mudguard.

"Q. And then that was fixed, you say, after you reported it? A. After I reported it; yes, sir.

"Q. And then the step remained all right until about five days before the accident happened? A. Yes, sir.

"Q. Then what developed five days before the accident? A. Well, there was two nuts missing.

"Q. Two nuts missing? A. Yes, sir.

"Q. Completely gone? A. Yes, sir.

"Q. When did you notice that? A. The day I turned in the report.

"Q. That was five days before the accident? A. Yes, sir.

"Q. You hadn't noticed them before? A. Not that they were off; no, sir.

"Q. Had you noticed they were loose? A. No, sir; I did not.

"Q. The first thing you noticed is when they were completely gone? A. Yes, sir.

"Q. Then you reported it? A. Yes, sir.

"Q. And the next morning there were two new nuts on it? A. Yes, sir.

"Q. Did they fix it all right? A. There was a kind of a sway in it; just a fraction of a movement in it.

"Q. How much of a sway? A. Not very much.

"Q. Did you make an examination of it to find out what caused it to sway after the nuts were put back on? A. Well, I looked underneath there and seen that they were on there.

"Q. Well, how much did it sway; can you give us any idea? A. Oh, I guess no more than about an eighth of an inch.

"Q. It only swayed an eighth of an inch? A. Yes, sir.

"Q. You mean when you stepped on it, it would move, in other words, about an eighth of an inch? A. Yes, sir.

"Q. And did that condition continue up until the time your accident happened? A. Yes, sir.

"Q. How much was the swaying when your accident happened? A. About two inches.

"Q. You mean it would go two inches both ways? A. No; two inches in.

"Q. And then also two inches out? A. No, sir.

"Q. Would it only sway one way? A. It swayed in.

"Q. About two inches? A. Yes, sir.

"Q. How long had it been swaying two inches? A. I don't remember until after I fell off; that is how I found out it swayed about two inches.

"Q. You mean you found it swayed after you had fallen? A. After I had fallen.

"Q. You didn't find it swayed before you had fallen? A. No, sir.

"Q. Before you had fallen you never noticed it sway that way? A. No, sir.

"Q. It was only after you fell you noticed it swaying? A. Yes, sir.

"Q. Before you fell it was rigid? A. Yes, sir.

"Q. It was tight before you fell? A. Tight.

310·

"Q. And immediately after you fell you discovered this swaying?
A. Yes, sir.
"Q. And that was the first time you discovered that sway? A. Yes, sir."

Mr. Provence, defendant's foreman, testified that the plaintiff told him how the accident occurred, that he had slipped on the ice on the pavement and had come down on his elbow; that the plaintiff never complained to witness about the defective step. Defendant's office manager, Wasser, testified that the wagon had been bought a very short time before the accident.

Augustus Hambrick, the stablejack, swore that the plaintiff never reported to him that the step of the wagon was defective or out of order.

August Kramme, the route man for the defendant, testified that plaintiff told him he slipped on the sidewalk and hit his elbow on the sidewalk.

Vaughn, a driver, and other witnesses testified to hearing the plaintiff say that he slipped on the sidewalk and injured his arm.

Defendant introduced a report made by the plaintiff to an insurance company in which he said that he got off the wagon on the sidewalk and slipped and fell on the ice-covered sidewalk. Also a report made by plaintiff to defendant in which he said his foot slipped on the sidewalk, due to it being covered with ice, and he fell, striking his right elbow on the sidewalk.

A statement by Metzler, witness for the plaintiff and employee of the Dairy Company, was introduced in evidence in which he said that when Schneider was hurt he came into the office with his arm tied up, but made no mention of the step of the wagon.

The instruction requires the jury to find that the step which the defendant furnished was dangerous and the defendant failed to exercise ordinary care in furnishing it. That is in accord with the allegations of the petition.

What is meant when it is said that an employer "furnishes" an appliance to an employee? According to the dictionary definitions which appear most appropriate, "to furnish" means "to equip," "to fit out," "to supply," and in Corpus Juris it is "to deliver," "to equip," "to hand," "to provide anything needed by another," "to provide for use what is necessary."

All those conditions applied here would mean the condition of the wagon and the step at the time it was handed to the plaintiff for use. If to *furnish* a safe appliance or instrument means to *keep* such appliance or instrument in safe condition after its delivery to employee, then another rule would apply as to the master's duty. The respondent argues that the instruction is all right because it required the jury to find the step defective and the defendant guilty

of negligence in furnishing it, which implied knowledge or want of care in not knowing of the defect; therefore it was not necessary to require the jury to make that specific finding.

That principle might apply to an instrumentality if defective at the time it is supplied. If it becomes defective after it is put into use and is used by the servant, the master is guilty of negligence if such defect produces injury, provided he knew or by the exercise of ordinary care could have known that it had become defective. It involves the duty of ordinary care to inspect. That is what is meant by the continuous duty of the master to exercise reasonable care to keep the servant supplied with reasonably safe appliances. [Ogan v. Railroad, 142 Mo. App. l. c. 252; Halloran v. Pullman Co., 148 Mo. App. l. c. 248; Harris v. Railroad, 146 Mo. App. 532; Lutgen v. Standard Oil Co., 287 S. W. 885, l. c. 888; Buckner v. Horse & Mule Co., 221 Mo. l. c. 709.] The plaintiff swore that the step got out of repair and defendant repaired it on two occasions, and even if his evidence tended to show that the defendant was negligent in failing to use care to keep the appliances in repair, this evidence was contradicted by the evidence for the defendant. It became, then, a question for the jury to determine whether the defendant knew or by the exercise of ordinary care could have known that the step got out of repair, and was thereby negligent in failing to keep it in repair. Therefore the instruction was erroneous.

II. We come then to the question whether a submissible case was made out. From what has been said above that depends upon whether the defendant was charged with knowledge of a defect in the step. For an employer to be negligent in failing to keep in safe condition the appliances furnished to an employee he must have had knowledge of a defective condition or it must have been such that ordinary inspection would have revealed it. In Wilson v. Mo. Pac., 5 S. W. (2d) 21, it is said:

"The fact that appellant was hauling a defective car, and the further fact that its employee suffered injury, are not of themselves sufficient to impose liability. . . . To have been negligent it [the employer] must have had knowledge, actual or constructive, of the defective condition." [Removich v. Construction Co., 264 Mo. l. c. 56; Hoffman v. White Lime Co., 317 Mo. l. c. 99.]

Plaintiff's evidence fails to show any defect in the step at the time he received the wagon for use, any defect which later caused his injury. On the contrary he tells exactly what caused his trouble. Two nuts were missing. He reported his first trouble to Mr. Provence, the foreman who directed him, and to the stablejack whose name was Gus. He discovered next day that new nuts were put on. These were the nuts by which the step was fastened to the mudguard.

Then no trouble for three months. He used the wagon until four or five days before the accident. In getting off at the time he lost his balance and fell. He looked to see what was the matter. He said: "As I fell on the sidewalk I looked under the wagon *to see what the trouble was and I found two nuts missing underneath.*"

He did not discover any trouble other than the two missing nuts underneath. Whether they were the same nuts which had been replaced for missing nuts before he did not say, but the missing nuts were the trouble. He reported that to Gus. Two new nuts were placed on the bolts and he tried out the step. He did not ask for new bolts or any further repair. Plaintiff tried it out himself, undertook the inspection and found it swayed about an eighth of an inch. He reported that to Gus and Gus said that it would adjust itself in the course of time. He does not claim anywhere that swaying to that extent made it dangerous or that he could possibly have fallen on that account. That condition continued up until the time of the accident. Then he said the step swayed about two inches, and the accident was caused by that swaying. He did not say what caused it to sway two inches. On the two previous occasions when the defect was caused by the absence of nuts on the bolts, two nuts in each instance were absent. In the first instance, the nuts which fastened the step to the mudguard. He does not say that two nuts or any nuts were missing at the time he was hurt. He did not look to see what made the step sway then. He was able to do so, for he continued to deliver milk. His petition is not based on the *res ipsa loquitur* rule. He alleges specific negligence: "the step . . . was not properly secured or supported." It was properly secured when he first got it. It became insecure on two previous occasions by the loss of nuts. He knew *then* the exact cause of the insecurity. But when he was hurt did not examine, did not look or try to ascertain what made it insecure and sway. He did not prove nor attempt to prove any specific defect, so that defendant might be able to meet the evidence. If there was a specific infirmity in the step it was for him to show it was one which the defendant by the exercise of ordinary care should have known. A hidden and undiscoverable defect could not have been charged to defendant's negligence. In fact, up to the very time he fell it was rigid, "tight." He discovered nothing wrong with it. He failed to prove any defect which the defendant by ordinary care could have known in time to prevent the injury. Therefore a submissible case was not made out.

The judgment is reversed and the cause remanded. All concur.